**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 08-CR-46-LRR |
| vs. | **ORDER** |
| BENJAMIN MITCHELL, | |
| Defendant. | |

## *I. INTRODUCTION*

The matter before the court is the government's "Motion for Preliminary Ruling Regarding Admissibility of Testimony of Witness Amanda Mitchell" ("Motion") (docket no. 33).[1]

## *II. RELEVANT PRIOR PROCEEDINGS*

On September 23, 2008, a grand jury returned a one-count Indictment (docket no. 1) against Defendant Benjamin Mitchell. Count 1 charges Defendant with being an Unlawful User of Controlled Substances in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). The Indictment also contains a forfeiture provision

---

[1] The government filed the Motion under seal without disclosing its reasons for doing so. *But see* LR 5.c (requiring government to seek permission before filing documents under seal, unless the document is a "system-sealed document"); Administrative Order No. 07-0008-P (listing the various "system-sealed" documents, including documents relating to grand jury matters, but requiring the government to state that a system-sealed document was "FILED UNDER SEAL PURSUANT TO ADMINISTRATIVE ORDER" (emphasis in original)). Accordingly, the court shall order the Motion to be unsealed. In any event, the court finds public disclosure of the Motion and instant Order is authorized under Federal Rule of Criminal Procedure 6(e)(3)(E)(i). Further, the parties discussed the Motion in open court at the Final Pretrial Conference; the unsealed Motion in Limine (docket no. 31) discusses the Motion; and the substance of Mrs. Mitchell's grand jury testimony is not at issue.

for Defendant's Winchester shotgun, pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c).

On January 9, 2009, the government filed the Motion.[2] Defendant and counsel for Mrs. Amanda Mitchell f/k/a Miss Amanda Muehlemann have not filed responses to the Motion, although the time for doing so has not passed. In light of obvious time constraints—trial is scheduled to begin on January 21, 2009—the court elects to rule on the Motion without waiting for a response. *See* LR 7.e ("[I]f circumstances . . . warrant, the court may elect to rule on a motion without waiting for a resistance or response.").

### III. BACKGROUND

On June 22, 2007, law enforcement officers entered Defendant's home. Armed with an arrest warrant for a prior assault, they found Defendant and his then-girlfriend, Amanda Muehlemann, sleeping together in Defendant's bedroom. A loaded Winchester 12-gauge shotgun was propped up against the wall near Defendant.

The law enforcement officers woke up Defendant and arrested him on the warrant. Besides the shotgun, the law enforcement officers found an assortment of marijuana and marijuana-related items strewn about the house. They found marijuana stems, drug paraphernalia and a "blunt" in Defendant's bedroom.

Later that same day, a law enforcement officer read Miss Muehlemann her *Miranda* rights and asked her to give a statement. Miss Muehlemann complied and answered the law enforcement officer's questions. She then signed a written statement, in which she stated Defendant was a marijuana user and had held "the gun like a hunter while he was in bed." Gov't Ex. 1 (docket no. 33-2), at 1. Miss Muehlemann admitted she was also

---

[2] The Motion is untimely. The deadline for filing trial-related motions, including motions in limine, was January 5, 2009. *See* Trial Management Order (docket no. 11), at 2. Further, the government did not ask the court to extend the deadline for filing trial-related motions. Because the court denies the Motion on its merits, it need not decide whether the Motion should be stricken.

a marijuana user and had "held the gun more than one time when [she] was with [Defendant]." *Id.* Months later, Defendant and Miss Muehlemann pleaded guilty to marijuana possession in state court. They opined that "marijuana should be legalized." Def.'s Motion in Limine (docket no. 31), at 3.

In 2008, the federal government undertook its own investigation of Defendant. The government subpoenaed Miss Muehlemann to testify before the grand jury on June 10, 2008. Miss Muehlemann arrived at the appointed place and time with her lawyer, Mr. Michael Lahammer. Miss Muehlemann advised the government she had married Defendant the previous day, June 9, 2008, and changed her name to Mrs. Amanda Mitchell.

Despite their recent nuptials, Mrs. Mitchell decided to testify before the grand jury. In a letter written to Mr. Lahammer ("First Letter"), the government promised Mrs. Mitchell "informal use immunity as to information and testimony she may provide to the [grand jury]" if she testified completely and truthfully. Gov't Ex. 2 (docket no. 33-3), at 1. The government expressly reserved the right to prosecute Mrs. Mitchell "for any criminal charge provided the evidence used in any such prosecution was derived from leads, sources or information obtained independently of any information provided by her . . . ." *Id.* Mrs. Mitchell, Mr. Lahammer and counsel for the government signed the First Letter. The First Letter does not mention Mrs. Mitchell's adverse spousal testimonial privilege under Federal Rule of Evidence 501 and the federal common law as modified by *Trammel v. United States*, 445 U.S. 40, 50 (1980).

On December 24, 2008, Mrs. Mitchell, Mr. Lahammer and counsel for the government signed a similar letter ("Second Letter"). In the Second Letter, the government promised Mrs. Mitchell "informal use immunity as to information and testimony she may provide to the [petit] jury in her testimony at the trial of [Defendant], currently scheduled for January 20, 2009, and other proceedings, as required." Gov't Ex.

3 (docket no. 33-4), at 1. Again, the government expressly reserved the right to prosecute Mrs. Mitchell based upon other independently derived information or if she did not testify completely and truthfully. The Second Letter also states that the government's promise of "informal use immunity is conditioned upon [Mrs.] Mitchell's voluntary waiver of her adverse spousal [testimony] privilege." *Id.*

On January 7, 2009, Mr. Lahammer sent counsel for the government a letter ("Third Letter"). In the Third Letter, Mr. Lahammer wrote: "My client has informed me that she withdraws her previous waiver of Spousal Privilege and now wishes to reassert her Spousal Privilege and decline to testify against her husband, Ben Mitchell." Gov't Ex. 4 (docket no. 33-5), at 1.

## IV. MOTION

In the Motion, the government indicates it intends to call Mrs. Mitchell as a witness in her husband's trial. The government asks the court to issue a pre-trial order, in which the court declares that Mrs. Mitchell may not assert a privilege against testifying against her husband. The government cites Federal Rule of Evidence 104 and Federal Rule of Criminal Procedure 12(d)[3] as authority for such a pre-trial ruling.

### A. Legal Authority

Federal Rule of Evidence 104(a) provides that "[p]reliminary questions concerning . . . the existence of a privilege . . . shall be determined by the court . . . ." Fed. R. Evid. 104(a). Federal Rule of Criminal Procedure 12 states:

> The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal. When factual issues are involved in deciding a motion, the court must state its essential findings on the record.

---

[3] The government erroneously cites and quotes from what appears to be an old version of Federal Rule of Criminal Procedure 12(e).

4

Fed. R. Crim. P. 12(d).

Here, the Motion presents a preliminary question concerning the existence of a privilege, namely, whether Mrs. Mitchell may assert the adverse spousal testimony privilege at Defendant's trial. Further, the court does not find good cause to defer ruling. Accordingly, the court holds Federal Rule of Evidence 104(a) and Federal Rule of Criminal Procedure 12(d) grant the court the legal authority to issue a pretrial ruling on the Motion. *See, e.g., United States v. Pensinger*, 549 F.2d 1150, 1151-52 (8th Cir. 1977) (affirming district court's decision to rule upon existence of spousal privilege, pursuant to Rule 104).

### B. *Adverse Spousal Testimony Privilege*

#### 1. *Law*

In relevant part, Federal Rule of Evidence 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed. R. Evid. 501. "Federal courts recognize two distinct marital privileges: the marital confidential communications privilege and the adverse spousal testimony privilege." *United States v. Espino*, 317 F.3d 788, 795 (8th Cir. 2003). Only the adverse spousal testimony privilege is at issue here.

"Under the adverse spousal testimony privilege, an individual 'may be neither compelled to testify nor foreclosed from testifying' against the person to whom he or she is married at the time of trial." *Id.* at 796. "The privilege . . . rests with the testifying spouse who may waive the privilege without consent of the defendant spouse." *Id.*; *see, e.g., United States v. Bad Wound*, 203 F.3d 1072, 1074-76 (8th Cir. 2000) (holding

witness-spouse waived adverse spousal testimony privilege). The purpose of the adverse spousal testimony privilege is to "promote[] the public's interest in marital harmony." *Espino*, 317 F.3d at 795; *see also Trammel*, 445 U.S. at 44 ("The modern justification for this privilege against adverse spousal testimony is its perceived role in fostering the harmony and sanctity of the marriage relationship."). The adverse spousal testimony privilege shields the witness-spouse from "the 'cruel trilemma' of perjury, contempt, or betrayal of the [defendant-spouse]." Graham C. Lilly, *An Introduction to the Law of Evidence* § 9.4, at 450 n.15 (3d ed. 1996) ("*Lilly on Evidence*") (citing *In re Agosto*, 553 F. Supp. 1298, 1309 (D. Nev. 1983)).

The adverse spousal testimony privilege exists so long as the witness-spouse and the defendant-spouse are married. *See, e.g., Pereira v. United States*, 347 U.S. 1, 6 (1954) (recognizing "generally accepted rule" that divorce destroys adverse spousal testimony privilege). It is not limited to confidential communications and extends to testimony about matters pre-dating the marriage. *See, e.g., United States v. Byrd*, 750 F.2d 585, 590 (7th Cir. 1984) ("The testimonial privilege, should the witness-spouse assert it, applies to all testimony against a defendant-spouse, including testimony on nonconfidential matters and matters which occurred prior to the marriage.") (citing 2 Weinstein, *Evidence* § 505-23 (1984)); *A.B. v. United States*, 24 F. Supp. 2d 488, 491-92 (D. Md. 1998) ("[L]imiting the privilege to only those events which occur after a marriage undermines the purpose of the privilege. The effect on a marriage would be equally damaging whether the facts about which the witness spouse testified occurred before or after the marriage."). *But see United States v. Clark*, 712 F.2d 299 (7th Cir. 1983) (Gibson, J., sitting by designation) ("By imposing a general rule that the privilege does not cover premarriage acts, courts can avoid mini-trials on the issue of the sincerity of the parties in getting married. The limitation on the scope of the privilege of a spouse not to testify is consistent with the general policy of limiting [it] because it interferes with fact-finding."). "It usually blocks adverse testimony

6

based on knowledge gained in any way, at any time, even if it is common knowledge, if the accused and the proposed witness are married at the time of trial." *Lilly on Evidence* § 9.4, at 449.

As a rule of exclusion that "contravene[s] the fundamental principle that 'the public . . . has a right to every man's evidence[,]' *United States v. Bryan*, 339 U.S. 323, 331 (1950)[,]" the adverse spousal testimony privilege "must be strictly construed . . . ." *Trammel*, 445 U.S. at 50. Nonetheless, the Supreme Court has recognized that "[n]o other testimonal privilege sweeps so broadly" as the adverse spousal testimony privilege. *Id.*

### 2. Analysis

The government does not dispute that Mrs. Mitchell is married to Defendant or that the testimony it intends to elicit from Mrs. Mitchell at trial falls within the scope of the adverse spousal testimony privilege. Instead, the government argues Mrs. Mitchell twice waived her right to assert such privilege at Defendant's trial. The government opines (1) Mrs. Mitchell "expressly waiv[ed] the adverse spousal testimonial [sic] privilege" in the Second Letter, Motion at 7, and (2) implicitly waived such privilege when she testified before the grand jury while it was investigating Defendant. The court considers these two arguments, in turn.

#### a. Express waiver

The government contends Mrs. Mitchell expressly waived her adverse spousal testimony privilege in the Second Letter. The government characterizes the Second Letter as a binding "agreement," Motion at 3, under which the government promised Mrs. Mitchell limited use immunity in exchange for her testimony at Defendant's trial. The government points out that the Eighth Circuit Court of Appeals has "consistently" recognized that a witness-spouse may waive her adverse spousal testimony privilege. Motion at 4-5 (citing *Espino*, 317 F.3d at 794-96; *Bad Wound*, 203 F.3d at 1074-76).

The law is clear that a witness-spouse may waive the adverse spousal testimony

7

privilege. *United States v. Jackson*, 939 F.2d 625, 627 (8th Cir. 1991); *see, e.g., Trammel*, 445 U.S. at 53 (finding waiver where spouse chose to testify against spouse); *Espino*, 317 F.3d at 794-96 (same); *Bad Wound*, 203 F.3d at 1074-76 (same). However, the government's cited cases are inapposite here. In *Espino* and *Bad Wound*, the witness-spouse *agreed* to testify against the defendant-spouse when the time for trial arrived; in each case, the Eighth Circuit Court of Appeals was only concerned with a defendant-spouse's objection on appeal to the validity of the witness-spouse's waiver of her adverse spousal testimony privilege. *Espino*, 317 F.3d at 794-96; *Bad Wound*, 203 F.3d at 1074-76. In contrast, Mrs. Mitchell has made clear on the eve of trial that she does *not* want to testify against her husband. *Espino* and *Bad Wound* are only relevant to the case at bar insofar they intimate the Eighth Circuit Court of Appeals's view that (1) a witness-spouse may waive her adverse spousal testimony privilege; (2) any waiver must be knowing, voluntary and sufficiently specific; and (3) a grant of immunity and assurances of lenient treatment to the witness-spouse do not necessarily render the witness-spouse's testimony involuntary or otherwise destroy her express waiver of the adverse spousal testimony privilege. *See, e.g., Espino*, 317 F.3d at 796 (reiterating the Supreme Court's view that "a witness-spouse's agreement to testify after a grant of immunity and assurances of lenient treatment does not render his or her testimony involuntary" (citing *Trammel*, 445 U.S. at 53).

Here, the court finds Mrs. Mitchell did not knowingly, voluntarily and with sufficient specificity waive her adverse spousal testimony privilege in the Second Letter. The Second Letter is a far cry from the plea agreements at issue in *Espino* and *Bad Wound*. In *Espino*, the witness-spouse expressly waived her adverse spousal testimony privilege "in exchange for the possibility of reduced sentences in [her] own drug prosecution[]." 317 F.3d at 791. In *Bad Wound*, the witness-spouse signed a plea agreement in which she obligated herself to testify against her husband in exchange for dismissal of criminal

8

charges against her. 203 F.3d at 1075. Nowhere in the Second Letter did Mrs. Mitchell promise to testify against Defendant. Analogizing from the law of contracts, in the Second Letter there is no "assurance . . . that performance will be rendered in the future, given in a manner that the other party could rely on it." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996); *cf. United States v. Norris*, 439 F.3d 916, 919 (8th Cir. 2006) (stating that ordinary contract principles must be applied to interpret plea agreements). At most, the Second Letter evinces the parties' understanding that, if Mrs. Mitchell were to testify against Defendant completely and truthfully, the government would grant her limited use immunity for such testimony. The Second Letter does not specifically place an affirmative duty upon Mrs. Mitchell to waive her adverse spousal testimony privilege and cooperate with the government against her husband. The terms of the Second Letter are so equivocal and conditional that the court cannot imply a promise on the part of Mrs. Mitchell to testify against her husband. *Cf. Bad Wound*, 203 F.3d at 1074-76 (finding sufficiently specific waiver of the adverse spousal testimony privilege, where the witness-spouse's "broadly phrased" plea agreement stated in general terms her obligation to cooperate with the government).[4]

### b. *Implied Waiver*

The government also contends Mrs. Mitchell impliedly waived her adverse spousal

---

[4] Even if Mrs. Mitchell had promised the government in the Second Letter to waive her adverse spousal testimony privilege, it is wholly unclear whether such promise would be irrevocable. *See Bad Wound*, 203 F.3d at 1078-79 (Loken, J., concurring) (pointing out that it is an open question in the Eighth Circuit whether a prior waiver of the adverse spousal testimony privilege may be withdrawn at trial and opining that "[a]ssertion of the adverse spousal testimony privilege may well breach a plea agreement to cooperate, but that is not the same as concluding that a plea agreement waiver may not be withdrawn, so that the spouse's promise to testify can be specifically enforced") (discussing *Stevens v. Marks*, 383 U.S. 234 (1966)); *cf. Lilly on Evidence* § 9.4, at 449 (opining that a witness-spouses who testifies against a defendant-spouse "may still be entitled to invoke selectively the confidential communications privilege").

9

testimony privilege when she testified before the grand jury in Defendant's case. The government contends the mere fact Mrs. Mitchell testified before the grand jury is evidence that her marriage with Defendant is in trouble. The government thus concludes that the underlying purpose of the privilege, the public's interest in preserving marital harmony, "has long since dissolved." Motion at 7. The government does not, however, cite any legal authority for its implied-waiver argument.

As a threshold matter, the court finds the government's opinion that the Mitchells' marriage is in trouble to be wholly speculative. There is no evidence Defendant has sought to divorce Mrs. Mitchell or any other indication in the record that their marriage is doomed. Mrs. Mitchell's unwillingness to testify against her husband at his upcoming trial indicates their marriage may be relatively healthy. To compel Mrs. Mitchell to testify against Defendant now would only encourage marital disharmony, which the adverse spousal testimony privilege is designed to forestall. Accordingly, in the complete absence of any cited legal authority and with only the government's speculative musings for evidence, the court is unwilling to carve out a new theory of implied waiver of the adverse spousal testimony privilege and compel Mrs. Mitchell to testify against Defendant.

In any event, it appears highly unlikely that the Supreme Court or the Eighth Circuit Court of Appeals would find an implied waiver of the adverse spousal testimony privilege on these facts. In *Trammel*, the seminal case on the adverse spousal testimony privilege, the Supreme Court recognized a distinction between a spouse agreeing to "give information concerning [the other spouse] or to aid in [his] apprehension" and testifying against the other spouse within the confines of a courtroom. 445 U.S. at 913 n.12. Similarly, there is a distinction between secretly testifying *ex parte* against one's spouse before a grand jury and entering a courtroom, staring in such spouse's eyes and actively helping the government to put him in prison.

This is not a case in which the witness-spouse testified in open court against the

defendant-spouse and simply refused to reiterate such testimony at a later proceeding. Waiver in the privilege context rests upon the principle that, "when a secret is out, it is out for all time, and cannot be caught again like a bird, and put back in its cage." *People v. Bloom*, 85 N.E. 824, 826 (N.Y. 1908). Such principle does not apply here, because the contents of Mrs. Mitchell's grand jury testimony are largely secret and wholly inadmissible in the government's case-in-chief. In other words, a privilege is not waived by a disclosure if the disclosure is itself privileged. Proposed Fed. R. Evid. 510.[5]

## V. CONCLUSION

The Motion (docket no. 33) is **DENIED**. The government shall not be permitted to call Mrs. Mitchell as a witness against Defendant at trial so long as she continues to invoke her adverse spousal testimony privilege. *See, e.g., Grulkey v. United States*, 394 F.2d 244, 245 (8th Cir. 1968) (stating that permitting the government to call the witness-spouse to the stand to formally invoke her adverse spousal testimony privilege in front of the jury "may be without justification and under some circumstances could well result in prejudicial error").

**IT IS SO ORDERED.**

**DATED** this 15th day of January, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[5] Again, even if Mrs. Mitchell waived her adverse spousal testimony privilege when she signed the First Letter or testified before the grand jury, it is wholly unclear whether such promise would be irrevocable. *See supra* note 4.